# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2019-CP-01863-COA

**VETO F. ROLEY**                                                    **APPELLANT**

**v.**

**CHINELO J. ROLEY**                                               **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 07/02/2019 |
| TRIAL JUDGE: | HONORABLE MARK A. MAPLES |
| COURT FROM WHICH APPEALED: | JACKSON COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | VETO F. ROLEY (PRO SE) |
| ATTORNEY FOR APPELLEE: | JOHN SAMUEL GRANT IV |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| DISPOSITION: | AFFIRMED - 05/18/2021 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE CARLTON, P.J., GREENLEE AND SMITH, JJ.**

**CARLTON, P.J., FOR THE COURT:**

¶1. The Jackson County Chancery Court entered a final judgment granting a divorce to Chinelo Roley from Veto Roley on the ground of habitual cruel and inhuman treatment. The chancellor also awarded Chinelo sole physical and legal custody of the couple's two minor children. The chancellor denied Veto's post-trial motions. Veto appeals pro se, raising numerous assignments of error that we restate for clarity as follows: (1) whether the chancellor erred when he granted Chinelo a fault-based divorce based upon habitual cruel and inhuman treatment;[1] (2) whether the chancellor erred when he utilized the *Albright*[2]

---

[1] We include within this assignment of error Veto's assertions that the chancellor erred (1) when he determined that Chinelo met her burden of proof supporting a divorce based on habitual cruel and inhuman treatment using a "preponderance of the evidence"

factors in determining the custody of the couple's two minor children; (3) whether the chancellor erred when he denied Veto's post-trial Mississippi Rule of Civil Procedure 59 motion "without a de novo hearing" and without issuing findings of fact and conclusions of law pursuant to Veto's Rule 52 request; (4) whether the chancellor erred when he allowed Chinelo a tax deduction for the couple's minor son for the year 2018; (5) whether the chancery court displayed "judicial bias" during a June 5, 2018 motions hearing; (6) whether the chancellor denied Veto his "constitutional due process rights" when the chancellor enforced Mississippi Code Annotated section 11-51-29 (Rev. 2019) (requiring prepayment of appeal costs); (7) whether Mississippi Code Annotated section 93-11-65 (Rev. 2015) (governing testimony by children in divorce proceedings regarding custody preference) is an unconstitutional "prior restraint to [Veto's] children's right to free speech" and whether the chancellor violated the "minor children's First Amendment rights when [he] prevented them from testifying as to their custody preference"; (8) whether the Mississippi Electronic Courts (MEC) filing system "gives an unconstitutional advantage to represented litigants over pro se litigants," requiring "that pro se litigants be added to the MEC system" to remedy the situation; (9) whether the chancellor erred when he denied Veto's post-appeal motion to modify visitation with his children; and (10) whether the costs in this appeal should be taxed to the chancery court.

standard; and (2) when he relied on Chinelo's testimony regarding Veto's personal hygiene after Chinelo allegedly "committed perjury" in her testimony about Veto's bathing habits.

[2] *Albright v. Albright*, 437 So. 2d 1003 (Miss. 1983).

¶2.     For the reasons addressed below, we affirm the chancellor's final judgment.

**STATEMENT OF FACTS AND PROCEDURAL HISTORY**

¶3.     Chinelo and Veto married in 2006. They have two minor children, a girl who was born in 2012 and a boy who was born in 2007. In April 2017, Chinelo filed her complaint for divorce against Veto alleging as a fault ground habitual cruel and inhuman treatment, and alleging in the alternative irreconcilable differences. Veto filed an answer and counterclaim for separate maintenance.

¶4.     The chancellor bifurcated the trial and determined that the "fault issue" would be heard first. On November 16, 2017, the chancellor held a trial on Chinelo's request for a divorce based on habitual cruel and inhuman treatment. At that point, both parties were represented by counsel.

¶5.     Chinelo testified in support of her claim and also called two corroborating witnesses—Sally Noel, who had lived with Veto and Chinelo and had known them for a number of years, and Raphael Nnamani, who is Chinelo's then-twenty-year-old nephew and who had lived with the couple for one year and four months.

¶6.     Chinelo testified about Veto's inability to control his temper and derogatory comments and names directed to Chinelo, often in front of the children:

> At one point he was physical. He has pushed me. A couple of times I had to call someone to come in front of us . . . to help me because . . . he made me very scared. He . . . has always been verbally abusive in front of the kids, in front of the neighbors, in front of my friends. Every time that we have—like, one single fight is, like—it's a lot of outburst, a lot of shouting, a lot of anger. He has punched a hole in the wall twice—one in the hallway, one outside—in

3

his anger. You know, he scares me a lot with—when he's angry, I can't be able to stand in his presence. It's scary. At this point, I'm scared. He's controlling. And the verbal abuse has given me a lot of emotional and mental torture. I mean, . . . the children suffer when the house environment is like that. I can no longer be able to stay married to him in that condition.

¶7. Chinelo described the first incident she remembers where Veto was uncontrollably angry and confrontational with her:

> [T]he first incident happened in 2012, . . . when my son was still a baby. We had this lady, Sally Noel, staying with us [to help with the baby]. And I can't remember what happened, you know, what led to the incident itself, but I was carrying the child, and [Veto] was practically calling me names, pushing me . . . he had me, you know, pinned down on the wall . . . and I had nowhere to go. So I had to call . . . [Sally]. She was upstairs. I said, Sally, come down, please. And she came and she stood right between us and said, you can't touch her, you can't touch her, you know. So that was the first incident.

Chinelo then described an incident that happened in April 2017 when she had to call the police when "[Veto] was screaming at the top of his voice, calling me names. I said, don't call me names in front of my kids, the kids are here . . . . And then . . . I called the cops . . . [and] [h]e continued abusing me in front of the female cop who had to warn him to stop talking to his wife like that."

¶8. She described another time that the police were called to her home because of an altercation between Veto and Chinelo's nephew, Raphael, as follows:

> [CHINELO:] The second time that it happened [when police were called to her home], I . . . came in on the two cops standing in front of there. They were trying to calm him [(Veto)] down, you know. And then I walked in, I said, Veto, you need to calm down. He said, shut up, don't even talk right now, you shut up, you b**ch. And then I . . . just called my nephew, I said, let's go inside, let's

4

> go get the things that you wanted to get, and . . . let him finish up with the cop.

[COUNSEL
FOR CHINELO:] Okay. So, now, you mentioned about how he [(Veto)] shakes and how he stomps and walks around . . . . Does that happen a lot when he's angry?

[CHINELO:] Every time. Every time. That's his . . . reaction, you know. His—his anger is something else.

¶9. When asked to describe why she testified that she was fearful of Veto, Chinelo said:

> I mean, the—the anger, I don't know what he's going to do, you know. I have no idea what his anger will lead to, you know. He—he stomps like as if he's going to fight a war, you know. He—he's—like, when he's emotional, it's like as if there's—like something is going to bust, you know. I'm scared of it. I mean, like, every time I think, okay, what's going to happen now, what's going to happen now. It's in my head. You know, he's causing me too much stress, too much—well, mental stress.

¶10. Chinelo said that "[t]here's been instances of anger outbursts. I . . . cannot recollect how many." She testified that "the incident of [Veto] punching a hole in the hallway, . . . [and when he] punched a hole right outside [where the roof comes down on their home] . . . that's how much of his anger that was out there. His anger is scary."

¶11. On cross-examination Chinelo was asked why she "lived in fear of Veto" when the "pushing" incident in 2012 happened only once. She responded, "Because the . . . emotional and the verbal abuse, it overshadows that one." Later during cross-examination, Chinelo was again asked about this issue:

[COUNSEL
FOR VETO:] Okay. You said that you lived in constant fear that [Veto] would lose his temper as well as his mind in a fit of rage

5

and either kill or maim me; is that right?

[CHINELO:]          Uh-huh.

[COUNSEL
FOR VETO:]          And you admit that he's put his hands on you once?

[CHINELO:]          Once. I mean, he didn't punch me.  He just chested me, like . . . tried to hold me on the wall.

COUNSEL
FOR VETO:]          So what made you really believe he was going to do something to physically harm you if he had never done it before?

[CHINELO:]          Have you seen him angry?  Okay.

COUNSEL
FOR VETO:]          No, ma'am. I'm not part of this, so—

[CHINELO:]          Yeah. I have. It's scary.

COUNSEL
FOR VETO:]          So in ten years he's never harmed you, yet you still live in fear?

[CHINELO:]          Well, we cannot wait until the day he does. . . [y]eah, that's what I'm saying.  We cannot wait until the day he does that.

¶12.   Regarding the things Veto would tell the children about her, Chinelo described times when Veto would tell the children "right there in my face, you know, telling them I don't love them; mommy doesn't love you."  She further testified:

He does not care that the children should be separated from the things that happen with adults.  So he brings everything out to the children to hear, that your mom is evil . . . . [H]e tells [our son], your mommy is evil, . . . your mommy doesn't love you, your mommy doesn't love you, if she loves you, she

6

will stay here.

¶13. Chinelo also testified that "the worst part is that [Veto is] exposing my son to pornography. . . . This one is a major issue for me . . . . Veto watches this pornography on his phone and laptop, [and our son] got access to it."

¶14. Additionally, Chinelo testified about Veto's hoarding and refusal to clean (or allow her to clean) the downstairs of the home. Chinelo and the children lived in the upstairs of their home, Veto lived in a downstairs bedroom where the living room and kitchen were also located. Chinelo testified that "[Veto] likes to hold on to things. I will call him . . . a hoarder. He does not throw away anything. Nothing." Continuing, Chinelo said that

> [w]henever I clean up the house, he comes in in a panic. He starts walking around the house, like this, trying to find out where everything is. He does not like anything clean. He thrives on clutter. I mean, that would be his words. Everything—something is clean or in a place, . . . he goes . . . crazy. He just starts looking for it, looking. I clean up the pantry, put some expired food in the trash. He goes to the trash, digs them out, and . . . eats it or feeds it to the kids. It doesn't matter what. He does not care. He will go to the trash and pick up food that I've thrown away that has expired. You know, . . . he will not throw away one single thing.

¶15. Describing photographs shown to her at trial, Chinelo testified about food and clothes left by Veto on the floor of the lower level of their home where he lived, and the fact that "[t]he door [to his room] cannot open completely because he's packed up a lot of stuff inside the house. Like, he practically can't get in there. It's everything."

¶16. When shown a photograph of a rat in a trap, Chinelo testified that the photograph was taken in the kitchen of their home. She described hearing rat sounds among the clutter in

7

their home, stating, "I told [Veto] that . . . I started hearing sound of a rat. I said, there is a rat in this house, you know, we need to clean up some stuff, there's a rat in this house." They eventually bought a trap and caught the rat. She further testified that "[i]t's not that I cannot clean as much as I can. It's the fighting that I have to endure every time that I make an effort to clean the house."

¶17. In describing the lower level of their home, Chinelo testified that "there's nowhere to sit down. All the chairs are occupied with stuff. Everywhere is occupied with clothes and toys . . . . The kitchen, you can't even cook in it in there because the stove is covered up with stuff."

¶18. Due to Veto's anger when she would try to clean up their home, or because of how their home looked, Chinelo testified that with the exception of her best friend and relatives from Nigeria who understood the situation, she stated, "I don't have people come visit me in my home. I've never had anybody come visit [except] I think . . . one time after I had the baby in 2012, and then I invited some people from my . . . country to come and see the baby[.]"

¶19. Chinelo then described what occurred when she did decide to have a cookout in April 2017. When Chinelo had tried to clean up the house before the party, she threw away what she believed was one of Veto's used deodorant bottles. Chinelo testified that Veto said to her, "You f***ing b**ch. Stop throwing away my stuff, you f***ing b**ch." She continued, "he called me a witch, he called me stupid; you are the most stupid—stupidest

8

woman I've ever seen in my life, why would you throw away. . . my deodorant. . . . [A]nd that went on and on and on [so] that my nephew [Raphael] who stays with me had to take the kids out and said, you can't hear that, you know."

¶20.　Chinelo also testified about Veto's lack of personal hygiene and body odor and his unsanitary food-handling habits:

> I have to beg for [Veto] to brush his teeth. He goes three weeks without brushing his teeth. We talk about brushing his teeth. We talk about washing his hands after using the bathroom. We talk about, like, you do not feed the children or touch food in their mouths until you've washed your hands after using the bathroom.

She said that "at this point [Veto] will only bathe when he wants to come up and have what we call . . . sex" or " when he have to take a shower—when he have to go to work. So if he's not working, if it's no workday, then he will not bother to take a shower."

¶21.　Sally Noel was the next witness to testify as a corroborating witness for Chinelo. She had lived with Veto and Chinelo and had known them both for a number of years. She testified about her observations of Veto and Chinelo's relationship, stating that "there was always, you know, friction. There was always, you know, yelling and, you know, tempers flaring . . . ." She then went on to describe the 2012 altercation between Veto and Chinelo (that Chinelo also described in her testimony):

> [O]n this particular day, I actually was upstairs in the room and I heard Chinelo yelling my name, like in panic. So I ran down the stairs, and they were in an altercation and she was, like, you know, backed up against the wall, like this, and Veto was . . . like, almost maybe in the process of hitting her. And I guess she was afraid so she yelled for me, and I came down and I got in the middle and I said, you can't put your hands on her no matter what, you

9

know, you can't hit her. And, you know, they kept going, and then I said to her, you know, you need to go back upstairs.

¶22. Sally also testified about the condition of the couple's home, both when Sally lived there in 2008 (shortly after Veto and Chinelo's son was born) and when she had been at the home just weeks before the 2017 trial. She testified that when she lived there in 2008

> Chinelo's section . . . was clean and . . . an environment for the kid. . . . [Veto] slept downstairs in a bedroom and she slept upstairs with the kid . . . . Veto's room was always very filthy . . . . His living quarters, including the bathroom, was always very unsanitary[.]

¶23. Regarding her recent visit to the home just weeks before the November 2017 trial (after Chinelo had moved out), Sally said that "it was very chaotic. It's stuff everywhere. It looked like . . . pretty much like garbage everywhere; on the porch, inside, you know." She said that Veto told her "that it was because of the storm that it was like that. But I'm just saying that it is not an environment currently that you would want any kid to be in, regardless of whether or not it's a storm[.]"

¶24. Next, Raphael Nnamani, Chinelo's then twenty-year-old nephew, testified as a witness for Chinelo. Raphael lived with the couple before their separation and was living with Chinelo after she moved out of the home in May 2017. He testified about the "nagging and Veto's abuse towards my auntie [Chinelo]" that often occurred in front of the children. For example, Raphael described the April 2017 confrontation between Veto and Chinelo when she had attempted to clean their home and threw away what she thought was one of Veto's empty roll-on deodorant bottles:

10

So before that we had a party at home [(the April 2017 cookout)], . . . we have to, like, make everywhere clean. So I took the [roll-on deodorant bottles] that were totally empty. So when [Veto] came back, he asked for the roll-on. [Chinelo] said that we had to throw them away because . . . nothing is in them. So he started nagging and started shouting and started hitting his hand on the door. My auntie was like, well, it's empty, Veto. There's nothing she can do about it. She went upstairs to go eat her food. He followed her upstairs, . . . nagging and shouting, shouting and . . . calling her all sorts of things. Called her a witch. Called her a b**ch. Called her a bastard, different name. And all these things were happening in front of the kids. He doesn't care if the kids are there to say what he wants to say.

¶25. Another example Raphael gave regarding Veto's angry confrontations involved a confrontation between Raphael and Veto. As Raphael described it,

there was a time that I took out his clothes to wash mine, like from the laundry. He came right to my face. I was really scared that day. I thought he was going to beat the hell out of me. It was right in my face, trying to . . . to hit me. He's telling me I shouldn't do that [(take Veto's clothes out of the laundry)], I shouldn't do that.

¶26. Raphael also testified that Veto calls Chinelo "stupid in front of the kids." Raphael stated, "He doesn't—he doesn't avoid these shouts from the kids. He brings the problem to the kids." Raphael said, "[the children] cry all the time this shout happens, and this brings emotional trauma and . . . I get scared sometimes, if maybe he's going to throw something on my face or he's going to do something that would lead to something else." He further testified, "It happens mostly daily. Once my auntie, like, suggests something, on[c]e he does not agree, he starts yelling. He doesn't be like, okay, like just leave you. He . . . just lose it and he's just mentally unstable."

¶27. Raphael also corroborated Chinelo's testimony about Veto allowing their young son

11

to watch pornography on Veto's phone:

> [COUNSEL
> FOR CHINELO:]    Okay. Any other type of abuse that you've observed in the house?
>
> [RAPHAEL:]    Yes. When my auntie [Chinelo] was on her way out, so she told Veto to reduce . . . the time he gives . . . [their son] the phone to use. Like, [the child] uses the phone every single day. So when he uses that phone—he uses the phone to watch his Minecraft [(a video game)]. So he gets bored for watching something over and over again. So I found out that he watches—he [(the child)] watches porn [on] his dad's phone.

Raphael testified that the child showed him how he got to it (the pornography) through a link on Veto's phone. According to Raphael, he was there when Chinelo tried to talk to Veto about it, and Veto simply "didn't respond. He took it as nothing."

¶28.    Regarding Veto's personal habits, Raphael testified that

> Veto's . . . living room is a mess because everything he does . . . he eats and he keeps the plates in the living room. Everything is all a mess. His bathroom, his clothes on the floor. He has his underwear that has the poo on it. Like, his underwear always has poo on it.
>
> . . . .
>
> [W]hen [Veto] comes to give [the children] food, he doesn't wash—like, when he's done with the bathroom, he doesn't wash his hands before he makes their food. Like, he makes peanut butter and jelly sandwich. So when he places his hand on—the bread on his hand, that is nasty. So those stuff has bacteria on it. And the pot he uses to cook . . . he doesn't wash it. So everything is not—he doesn't even wash the stuff he uses.

¶29.    Raphael also said that "[Veto's] food, it's a mess. Like, when the stuff that is rotten, he doesn't throw them away. He still feeds them to the kids, and the kids get sick because

of that." For example, one time in April 2017 Raphael threw hotdog bread in the trash "because it was old and it wasn't good anymore. [Veto] went back into the trash to pick up the hotdog bread and gave it to [the child] for him to eat" and, according to Raphael, that made the child sick.

¶30. Regarding Veto's personal hygiene, Raphael testified:

[COUNSEL
FOR CHINELO:] Anything else that you observed having to do with cleanliness?

[RAPHAEL:] Well, yeah. He smells. Like, when I go to school, I come back, the house smells. When he passes, the house smells. He doesn't take a shower. He recently just started taking a shower when he . . . got a job. If he doesn't have a job, he stays, like, two days before he takes a shower.

¶31. After Raphael testified, Chinelo rested. Veto also rested without calling witnesses.

¶32. The chancellor then heard argument from both parties on whether Chinelo had proven grounds for divorce. An order was entered allowing both parties to submit proposed findings of fact and conclusions of law within sixty days. Veto's attorney was allowed to withdraw as his counsel on December 14, 2017, and Veto has represented himself since that date. Four days later, on December 18, 2017, Veto filed several motions pro se, including a "Petition to Have Minor Child [(his son)] Testify." The chancellor heard these motions on January 5, 2018. The chancellor granted Veto's petition to have his son testify and took testimony from

13

the minor in chambers.[3]

¶33.    Veto and Chinelo each filed their proposed findings of fact and conclusions of law at the end of January 2018. After considering the evidence and testimony presented by the parties and each side's proposed findings, the chancellor entered a judgment of divorce granting Chinelo a divorce based on habitual cruel and inhuman treatment. The judgment of divorce was entered on February 12, 2018.

¶34.    The chancellor found that a divorce was warranted because:

> As grounds for a Habitual Cruel and Inhuman Treatment divorce, Chinelo alleges that Veto was emotionally and physically abusive. Chinelo stated she was afraid whenever she was in Veto's presence. She also stated that Veto had no personal hygiene, and that she found his lack of personal hygiene extremely repulsive. Chinelo alleged that Veto never bathed or brushed his teeth unless he wished to have sex with her. She further testified that he was a hoarder, and did not clean the downstairs area of the marital home. The home was so cluttered and dirty that there were rats in the house. Chinelo presented photographs of the marital home in which there were bags of trash lying on the floors and counters. Because of this, Chinelo and her two (2) children were forced to live upstairs, away from Veto's clutter.
>
> Chinelo testified that she attempted to clean the marital home on several occasions. Every time she made this attempt, Veto would become angry at her. Sally Noel, a friend who lived with Chinelo and Veto for some time, corroborated Chinelo's testimony on this issue. She stated the house was very filthy and unlivable while she was there.
>
> Raphael Nnamani, Chinelo's nephew, also corroborated this testimony. He lived with Chinelo and Veto during the marriage and testified to several

---

[3] The chancellor's judgment of divorce entered on February 12, 2018, provides that the chancellor granted Veto's petition to have his son testify and took testimony from the minor in chambers. Neither the transcript from the January 5, 2018 hearing nor the chancellor's order granting the petition are in the record.

incidents involving Veto's unhygienic nature. He states that once, Veto dug expired hot dog bread out of the trash to eat. He testified that Veto would not throw away expired food. He also testified that Veto did not wash his hands before handling food. Raphael also stated that Veto always stunk because he never showered. He corroborated Chinelo's claim that everyone was forced to live in the upstairs portion of the marital home to avoid Veto's mess downstairs.

Based on the above, the Court hereby finds that there is sufficient evidence to grant Chinelo a divorce from Veto on the grounds of Habitual Cruel and Inhuman Treatment. Veto's lack of hygiene goes beyond a mere incompatibility, and is behavior so unnatural and infamous as to make the marriage revolting to Chinelo and render it impossible for her to discharge the duties of marriage. The Court hereby GRANTS Chinelo a divorce from Veto on the grounds of Habitual Cruel and Inhuman Treatment.

¶35. Two days after entry of the judgment of divorce, on February 14, 2018, the chancery court docket reflects that Veto filed several post-trial motions. Veto filed a "Rule 52 Motion for Additional Findings of Fact under Rule 52," as well as a "Rule 59 Motion for a Rehearing" and a "Rule 60 Motion for Relief from Judgment."[4] On February 20, 2018, Veto filed an amended motion for rehearing essentially seeking a new trial to reopen the case on the divorce grounds issue.

¶36. At the June 5, 2018 post-trial motions hearing, Veto withdrew his Rule 52 motion for additional findings, but proceeded with arguing his other motions. The chancellor granted Veto's amended Rule 59 motion for a rehearing to the extent that the record was reopened for Veto and Chinelo "to submit to the Court testimony pertaining to new matters not addressed during the bifurcated trial on divorce grounds."

---

[4] These motions are not in the record.

15

¶37.    Veto proceeded to call Chinelo as an adverse witness, and he re-questioned her on essentially the same points that were covered in the original November 16, 2017 trial.  When asked by Veto whether he ever "forced her to have sex," Chinelo said that he did not "force" her, but that he would demand "[t]o have sex when [she didn't] want to."  Chinelo admitted that on days that Veto had to go to work as a substitute teacher he would shower, but she clarified that he did not use any soap when he did so, and so he still smelled like body odor after showering.  In response to the chancellor's questioning, she said that this bothered her "a lot . . . [because] I mean, because he still . . . stinks."

¶38.    Chinelo also testified that Veto was "[v]erbally abusive, and sometimes I'm so scared. You need to see when he's mad.  I mean, I have a couple of videos that shows when he's mad.  When he's mad, you are scared.  You are shaking like you want to run away from there."  Chinelo confirmed that she was scared that Veto would hurt her if she had "stood directly in front of him" during one of his angry episodes.

¶39.    After hearing the evidence, including an audio recording of one of Veto's angry outbursts occurring in December 2017 (when Veto and Chinelo were still married),[5] the chancellor found it appropriate to appoint a guardian ad litem, because "this is abusive behavior from what I've seen."  Regarding Chinelo, the chancellor told Veto that "you reopening this case has opened my eyes to what she's [(Chinelo's)] been trying to tell me about your anger and behavior.  If that's the way it's going on, I firmly believe that she

_____

[5] The audio recording is not in the record.

16

deserves a divorce for cruel and inhuman treatment." The chancellor also ordered Veto to undergo a psychological evaluation.[6]

¶40. The chancellor denied Veto's Rule 59 motion for a new trial from the bench, and he entered his written order on that ruling on June 14, 2018. In this order, the chancellor "readopt[ed] the summary of law, findings of fact and conclusions of law set forth in the Judgment of Divorce filed on February 12, 2018." The chancellor also found that the "new testimony and evidence" from the June 5, 2018 hearing only served to further convince the chancellor he had made the correct ruling in granting a divorce to Chinelo based on habitual cruel and inhuman treatment. The chancellor found: "Veto was emotionally abusive and was unable to control his temper, that his personal hygiene was extremely repulsive, and his area of the home was filthy, cluttered and repulsive[.]" The chancellor articulated his ruling as follows:

> The Court reaffirms its prior finding that there is evidence sufficient to grant Chinelo a divorce from Veto on the grounds of Habitual Cruel and Inhuman Treatment and that Veto's lack of hygiene goes beyond a mere incompatibility and his outbursts, emotional abuse, and behavior is so unnatural and infamous as to make the marriage revolting to Chinelo and render it impossible for her to discharge the duties of marriage[.]

¶41. On July 5, 2018, Veto filed an interlocutory appeal with the Mississippi Supreme Court, challenging the chancellor's grant of a divorce to Chinelo and the denial of his post-trial motions. *See Roley v. Roley*, No. 2018-M-00966-SCT. The Mississippi Supreme Court

---

[6] The results of Veto's psychological evaluation are not in the record.

denied Veto's petition for interlocutory appeal on September 19, 2018, and denied Veto's motion for reconsideration on November 28, 2018.

¶42.    Less than a week later, on December 5, 2018, Veto filed a "Motion to Recuse [the chancellor] or, in the Alternative, Seek a Continuance Until After January 1, 2019."  Veto asserted in this motion that the chancellor should recuse himself from further proceedings in the case because, among other reasons, the chancellor was allegedly biased in the way he conducted the divorce-grounds trial and the June 5, 2018 hearing, in particular, and because he allegedly ignored the law and the evidence in granting Chinelo a divorce based on habitual cruel and inhuman treatment.  Alternatively, Veto requested that the chancellor "continue the trial until after January 1, 2019" (when the chancellor would be retiring).  Although the docket shows that Veto filed an "Affidavit of Defendant Concerning His Recusal" on the same day as his motion, the affidavit is not in the record.  Further, although the docket reflects that a "Notice of Court Setting" was filed the next day setting Veto's motion for recusal (among other motions) for a December 7, 2018 hearing, the record does not contain any transcript of this hearing.

¶43.    After the first chancellor presiding over this case retired at the end of 2018, the docket indicates that numerous motions were filed and proceedings were held before the second chancellor,[7] but were not included in the record.  Specifically, our review of the case docket

---

[7] We will use the term "chancellor" or "chancery court," and we will not distinguish between the first and second chancellor unless necessary for clarity.

shows that there were over three pages of docket entries between January 1, 2019, and July 2, 2019, and the only item included in the record during this time period is the second chancellor's July 2, 2019 twenty-page final judgment with findings of fact and conclusions of law. Although the chancellor's final judgment provides that "on June 7 and 26, 2019, [the court held a trial] for a final determination of issues related to custody, visitation, equitable distribution of property and related matters," the transcripts from this trial are not in the record.

¶44. In his July 2, 2019 final judgment, the chancellor thoroughly analyzed the *Albright* factors in determining custody of the couple's two minor children, and ultimately granted "sole physical and legal custody of the minor children to Chinelo." Among the other factors analyzed, the chancellor found that neither minor child was of an age sufficient to express a preference in custody, pursuant to section 93-11-65(1)(a). The chancellor granted Chinelo sole legal custody of the minor children "because of Veto's inability to co-parent with Chinelo, which is evident in the way he constantly disparages her in front of the children," and granted Veto supervised visitation and telephonic visitation. Additionally, the chancellor ordered Veto to pay child support according to the child support guidelines. Regarding taxes, the chancellor ordered the parties to each claim one child as a dependent, unless Veto was not current on his child support, in which case Chinelo would claim both children. Because the chancellor found that Veto was not current on child support for 2018, he ordered that Chinelo could claim both children for 2018 taxes. The chancellor also ordered Chinelo to

19

cover both children for health insurance, with the parties splitting uncovered expenses. The chancellor then applied the *Ferguson*[8] factors and divided the property. Finally, the chancellor denied Veto's request for alimony.

¶45.    Veto filed a post-trial "motion to reconsider" the chancellor's final judgment on July 12, 2019. Among the issues raised in this motion, Veto challenged the constitutionality of section 93-11-65(1)(a) that provides, in relevant part, that under certain conditions "the chancellor may consider the preference of a child of twelve (12) years of age or older as to the parent with whom the child would prefer to live in determining what would be in the best interest and welfare of the child." Within his motion to reconsider, Veto also included a motion for a new trial or to alter or amend the judgment pursuant to Rule 59, as well as a "Rule 52(a) Motion for this Court to Memorialize in Writing its findings of Law and Fact on each Allegation made by Defendant of Error and Judicial Misconduct." On November 4, 2019, Veto filed a "Motion for Clarity on Income Tax." The chancellor denied these motions, among others, in its order entered November 14, 2019.

¶46.    On December 12, 2019, Veto appealed the chancellor's final judgment. In his notice of appeal, Veto listed as an issue on appeal the constitutionality of section 93-11-65(1)(a) and its age requirement. Veto also included within his notice of appeal a "Petition to Proceed In Forma Pauperis" in which he requested that the chancery court "waive all appellate filing fees including fees for the production of a transcript."

---

[8] *Ferguson v. Ferguson*, 639 So. 2d 921, 928 (Miss. 1994).

¶47. In that petition, Veto essentially challenged the constitutionality of Mississippi Code Annotated section 11-51-29, requiring prepayment of costs on appeal. He asserted that indigent litigants should be afforded the right to appeal in divorce and custody cases without prepayment of costs, for the same reasons that due process requires they be allowed to proceed in the trial court on such matters despite an inability to pay. Veto filed an "Amended Petition to Proceed In Forma Pauperis" raising similar assertions on January 21, 2020. The chancellor denied the amended petition, noting that Mississippi law does not afford indigent civil litigants a right to proceed in forma pauperis on appeal to this Court. The chancellor did not address Veto's due process argument.

¶48. After filing his notice of appeal in December 2019, Veto filed numerous motions or notices with the Mississippi Supreme Court Clerk, including a "Rule 24(d) Notice of Challenge to Mississippi State Statutes" that Veto filed on February 24, 2020. In this notice, Veto advised the Attorney General of Mississippi of his constitutional challenges to section 11-51-29 (regarding prepayment of appeal costs) and section 93-11-65 (governing testimony by children in divorce proceedings regarding custody preference). Veto filed his appellant's brief on August 10, 2020, Chinelo filed her appellee's brief on October 20, 2020, and on October 28, 2020, the State filed its amicus curiae brief pursuant to Mississippi Rules of Appellate Procedure 29 and 44 to "to defend the validity of the statutes in question." The Mississippi Supreme Court assigned this appeal to the Mississippi Court of Appeals on November 5, 2020, and thereafter Veto filed his reply brief responding to both the appellee's

brief and the State's amicus curiae brief.[9]

## STANDARD OF REVIEW

¶49.   "We adhere to a limited standard of review when analyzing a chancellor's determinations in domestic-relations matters," *Gilmer v. Gilmer*, 297 So. 3d 324, 331 (¶13) (Miss. Ct. App. 2020), and we "review the facts involved in rendering a divorce decree in a light most favorable to the appellee." *Dickinson v. Dickinson*, 293 So. 3d 322, 326 (¶5) (Miss. Ct. App. 2020) (quotation marks omitted).   "We do not substitute our 'judgment for that of the chancellor, even if [we disagree] with the findings of fact and would arrive at a different conclusion.'"   *Smith v. Smith*, 90 So. 3d 1259, 1262 (¶7) (Miss. Ct. App. 2011) (quoting *Coggin v. Coggin*, 837 So. 2d 772, 774 (¶3) (Miss. Ct. App. 2003)). We further recognize that "[c]hancellors are afforded wide latitude in fashioning equitable remedies in domestic-relations matters[.]"   *Dickinson*, 293 So. 3d at 326 (¶5) (quoting *Henderson v. Henderson*, 757 So. 2d 285, 289 (¶19) (Miss. 2000)).   Accordingly, "[t]his Court will not disturb a chancellor's judgment when it is supported by substantial credible evidence unless the chancellor abused [his] discretion, was manifestly wrong or clearly erroneous, or applied an erroneous legal standard."   *Gilmer*, 297 So. 3d at 331 (¶13) (quoting *Branch v. Branch*, 174 So. 3d 932, 937 (¶9) (Miss. Ct. App. 2015)).   On questions of law, a de novo standard

---

[9] On December 14, 2020, Veto filed a "Notice of Information" that he had filed an ethics complaint against "[the first chancellor in this case] with the Mississippi Commission on Judicial Performance due to his unlawful ruling in the above styled case."   Additionally, Judge Anthony N. Lawrence III, on his own motion, recused himself from participation in this appeal by order entered December 16, 2020.

22

of review applies. *Id.*

## DISCUSSION

## I. Divorce Based on Habitual Cruel and Inhuman Treatment

¶50. Veto asserts that the chancery court erred in granting Chinelo a divorce based on habitual cruel and inhuman treatment because Chinelo failed to present sufficient evidence that she suffered "real harm" attributable to his alleged bad behavior. We find his assertions without merit for the reasons discussed below.

¶51. Mississippi Code Annotated section 93-5-1 (Supp. 2017) authorizes the chancery court to grant a fault-based divorce to a plaintiff on the ground of habitual cruel and inhuman treatment where the petitioner shows "by a preponderance of the evidence," *Gilmer*, 297 So. 3d at 331 (¶15),[10] that the defendant's behavior either:

---

[10] Veto asserts that a preponderance-of-the-evidence standard should not be applied in a habitual-cruel-and-inhuman-treatment case; he asserts a clear-and-convincing burden is more appropriate. However, since 1974, the Mississippi Supreme Court has held that a divorce on the ground of habitual cruel and inhuman treatment must be established by a preponderance of the evidence. *See, e.g., Wangler v. Wangler*, 294 So. 3d 1138, 1142-43 (¶16) (Miss. 2020), *reh'g denied* (May 7, 2020); *Smith v. Smith*, 614 So. 2d 394, 396 (Miss. 1993); *Wires v. Wires*, 297 So. 2d 900, 902 (Miss. 1974). This Court has likewise recognized that a preponderance of the evidence standard applies in establishing this fault-based ground for divorce. *See, e.g., Gilmer*, 297 So. 3d at 331 (¶15).

Accordingly, we reject Veto's contention on this point because as an intermediate appellate court, we are bound by established precedent and are not authorized to overrule a long line of cases that goes back many decades supporting this principle. As we stated in *Beckham v. Beckham*, 296 So. 3d 120, 124 n.4 (Miss. Ct. App. 2019): "[T]his Court does not have the authority to overrule or ignore Supreme Court precedent[.]" (quoting *Cahn v. Copac Inc.*, 198 So. 3d 347, 358 (¶35) (Miss. Ct. App. 2015)). Instead, we must follow it. *Id.* (citing *Rivera-Guadiana v. State*, 71 So. 3d 1221, 1224 (¶14) (Miss. Ct. App. 2011),

(1) endangers life, limb, or health, or creates a reasonable apprehension of such danger, rendering the relationship unsafe for the party seeking relief, or

(2) is so unnatural and infamous as to make the marriage revolting to the non-offending spouse and render it impossible for that spouse to discharge the duties of marriage, thus destroying the basis for its continuance.

*Id.* (quoting *Baggett v. Baggett*, 246 So. 3d 887, 892 (¶13) (Miss. Ct. App. 2017)). "[T]he [defendant's] conduct must exceed 'unkindness or rudeness or mere incompatibility or want of affection' and 'must be shown to have been systematic and continuous.'" *Id.* In this regard, the chancery court must employ "a dual focus on the conduct of the [defendant] and the impact of that conduct on the [plaintiff]" in determining whether a divorce based on the ground of habitual cruel and inhuman treatment is warranted. *Smith*, 90 So. 3d at 1263 (¶11). This is "a subjective inquiry" with the focus "on the effect the conduct has on the particular spouse, not its effect on an ordinary, reasonable person." *Gilmer*, 297 So. 3d at 331 (¶15) (quoting *Baggett*, 246 So. 3d at 892 (¶13)). "The plaintiff must show a casual connection between the defendant's conduct and the impact on the plaintiff," *Smith*, 90 So. 3d at 1263 (¶11), but the law no longer requires a strict causal connection between the defendant's conduct and the separation. *Id.* (citing Deborah H. Bell, *Bell on Mississippi Family Law* § 4.02[8][b]-[c] (2005)).

¶52. In general, the party alleging habitual cruel and inhuman treatment "must corroborate his or her own testimony." *Id.* at (¶12). In 2017, the Mississippi Legislature amended

---

*reh'g denied* (Mar. 24, 2020), *cert. denied*, 297 So. 3d 1109 (Miss. 2020)).

section 93-5-1 to provide for divorce based on "[h]abitual cruel and inhuman treatment, *including spousal domestic abuse*." Miss. Code Ann. § 93-5-1 (amendment indicated in italics).[11] The revised statute allows for corroboration in cases involving spousal domestic abuse by "the reliable testimony of a single credible witness, *who may be the injured party*," *id.* (emphasis added), and such testimony may include, but is not limited to

> That the injured party's spouse attempted to cause, or purposely, knowingly or recklessly caused bodily injury to the injured party, or that the injured party's spouse attempted by physical menace to put the injured party in fear of imminent serious bodily harm; or

> That the injured party's spouse engaged in a pattern of behavior against the injured party of threats or intimidation, emotional or verbal abuse, [or] forced isolation . . . if the pattern of behavior rises above the level of unkindness or rudeness or incompatibility or want of affection.

*Id.*

¶53. "As the trier of fact, the chancellor 'evaluates the sufficiency of proof based on the credibility of the witnesses and the weight of their testimony.'" *Littlefield v. Littlefield*, 282 So. 3d 820, 827 (¶19) (Miss. Ct. App. 2019) (quoting *Rawson v. Buta*, 609 So. 2d 426, 431

---

[11] This amendment was effective July 1, 2017. Miss. Code Ann. § 93-5-1. Chinelo filed her complaint for divorce in April 2017; however, all other relevant events took place after July 1, 2017. The chancellor conducted the fault portion of the bifurcated trial on habitual cruel and inhuman treatment in November 2017, granted Chinelo a divorce based on this habitual cruelty on February 12, 2018, and allowed Veto to present additional testimony on this issue on June 5, 2018; and the second chancellor entered his final judgment including all remaining issues on July 2, 2019. The amended statute, therefore, applies in this case. *See Gilmer*, 297 So. 3d at 334 n.2 (finding that amended section 93-5-1 applied where the complaint for divorce was filed in 2014, but the chancery court entered its order on October 4, 2017, granting the petitioner a divorce on the ground of habitual cruel and inhuman treatment).

(Miss. 1992)). "Divorces based upon habitual cruel and inhuman treatment are necessarily fact-intensive and require a case-by-case analysis." *Id.*

¶54. In this case, as we have detailed above, Chinelo testified about Veto's emotional and verbal abuse towards her, his disparaging remarks about Chinelo to the children and his frequent name-calling directed toward Chinelo (often in front of the children), at least one physical confrontation between Veto and Chinelo, and Veto's inability to control his temper. Chinelo also testified about Veto's hoarding and refusal to clean or allow her to clean the home's lower level where the kitchen and living room were located, his unsanitary food-handling habits, his lack of personal hygiene and strong body odor, and his unwelcome sexual demands.

¶55. Chinelo's corroborating witnesses, Sally Noel and Raphael Nnamani, also testified about a number of issues including Veto's angry outbursts, his "unsanitary" and "filthy" personal habits, Veto's frequent "nagging and . . . abuse" towards Chinelo, and other displays of undesirable behavior relating to Chinelo and the children, including Veto allowing their young son to be exposed to pornography on Veto's phone. Veto did not testify at the divorce-grounds trial or present any witnesses to testify on his behalf.

¶56. Further, as we have detailed above, at the June 5, 2018 hearing on Veto's post-trial motions, the chancellor reopened the record for the limited purpose of allowing the parties to submit testimony on new matters that had not been addressed during the divorce-grounds trial. Veto called Chinelo as an adverse witness and questioned her essentially on the same

26

issues covered at the trial. The chancellor also questioned Chinelo at this hearing. In response to Veto's questioning, Chinelo acknowledged that Veto did not "force" her to have sex, but she clarified that he would demand "[t]o have sex when [she didn't] want to." Additionally, as she had already acknowledged at the trial, Chinelo admitted that on days that Veto had to go to work as a substitute teacher he would shower—but she explained that he did not use any soap when he did so, and so his body odor still bothered her "a lot" because "he still stinks." Chinelo's testimony at this hearing also confirmed her fear of Veto "when he's mad" and his verbal abuse towards her.

¶57. We find that the record amply supports the chancellor's finding that Veto's conduct constituted habitual cruel and inhuman treatment toward Chinelo. *See, e.g., Dickinson*, 293 So. 3d at 327-30 (¶¶9-19, 22-23) (finding that the husband's conduct supported the chancellor's cruel and inhuman treatment determination where the husband was a hoarder, refused to allow the wife to clean the house, would have irrational outbursts when anyone threw away food, prevented the wife from having company over due to the trash and dishes throughout the house, made hateful comments around the children, yelled at the wife in public, made unsupported accusations of infidelity, and slashed the tires on the wife's vehicle).[12]

---

[12] Veto asserts that the chancellor committed

reversible error when he awarded Chinelo a divorce [on the ground of habitual cruelty and inhuman treatment] based on [Veto's] alleged poor hygiene when [Chinelo] committed perjury on the stand testifying under her attorney's direct examination that [Veto] didn't take baths but under cross examination . . . that

¶58. Veto asserts, however, that the chancellor committed reversible error in this case by granting Chinelo a divorce based upon habitual cruel and inhuman treatment because Chinelo did not present evidence of "real harm" to her resulting from his behavior. In particular, Veto asserts that Chinelo presented "[no] medical testimony as to the reality of her stress," or testimony describing physical or mental manifestations relating to her stress. We reject Veto's contentions for the reasons addressed below.

¶59. Although we recognize that Chinelo must show "harm to [her] health and well-being" caused by Veto's conduct, *Smith*, 90 So. 3d at 1266 (¶26), we also recognize that "no expert medical testimony on the point of [Chinelo's] health" is required. *Id.* at 1267 (¶28). And although Veto downplays the "stress" Chinelo suffered due to his pattern of intense angry outbursts and the conditions she was forced to live in, we observe that the "harm" Chinelo must show may be emotional or physical. *Id.* (citing *Faries v. Faries*, 607 So. 2d 1204, 1209

---

[Veto] had a regular habit of bathing.

We find Veto's assertions wholly without merit. As we address in detail above, we find that there is substantial evidence in the record supporting the chancery court's finding that Veto's conduct constituted habitual cruel and inhuman treatment toward Chinelo. We further find no error in the chancery court's granting Chinelo a divorce based upon this fault ground.

Regarding Veto's specific assertion that Chinelo "committed perjury" by claiming he did not take baths, we find no support for this assertion in the record. Rather, Chinelo testified without contradiction that Veto would not shower unless he had to work or wanted to have sex. When Veto, himself, was allowed to question her, Chinelo did not contradict herself, but instead explained that even when he did shower that he would not use any soap, and thus his odor still bothered her "a lot." Further, Chinelo's testimony was corroborated by other witnesses, who testified that Veto smelled and testified to a wide range of conduct indicating Veto's lack of proper hygiene. This issue lacks any merit.

28

(Miss. 1992)). Indeed, the Mississippi Supreme Court has explicitly recognized that "habitual ill-founded accusations, threats and malicious sarcasm, insults and verbal abuse may cause such mental suffering as to destroy health and endanger the life of an innocent spouse." *Holladay v. Holladay*, 776 So. 2d 662, 677 (¶64) (Miss. 2000); *see Dickinson*, 293 So. 3d at 330 (¶21) ("[T]here are many kinds of acts such as wilful failure to support, verbal abuse, neglect, and the like which, if taken alone will not constitute cruelty, but when taken together will manifest a course of conduct as a whole which may amount to cruelty.") (quoting *Jackson v. Jackson*, 922 So. 2d 53, 57 (¶8) (Miss. Ct. App. 2006)); *Johnson v. Johnson*, 281 So. 3d 70, 75 (¶22) (Miss. Ct. App. 2019) ("Habitual cruel and inhuman treatment may be in the form of emotional abuse when it falls 'along the lines of habitual ill-founded accusations, insults and threats.'" (quoting *Reed v. Reed*, 839 So. 2d 565, 570 (¶19) (Miss. Ct. App. 2003))).

¶60. We observe that in support of his assertions Veto relies on cases in which the facts were found to be insufficient to support a habitual-cruelty divorce, or cases in which the appellate court affirmed a habitual-cruelty divorce that Veto claims are distinguishable from this case.[13] We find relevant, however, that in doing so Veto ignores the fundamental

---

[13] Veto cites cases in which the appellate court, as *part* of its fact-intensive review of the case before it, recognized, for example, that the petitioner showed "no physical or mental health problems due to [the offending spouse's] conduct," or, for example, that the petitioner did not show "even [the] slight[est] impairment" to the petitioner's health. *Anderson v. Anderson*, 54 So. 3d 850, 854 (¶30) (Miss. Ct. App. 2010) (citing *Kergosien v. Kergosien*, 471 So. 2d 1206, 1210 (Miss. 1985)). As we address above, we do not find that this is the case here.

29

principle we have discussed above that "[w]hether the requirements to obtain a divorce on the ground of cruel and inhuman treatment are satisfied *is a fact intensive inquiry that generally must be decided on a case-by-case basis*." James W. Shelson, *Mississippi Chancery Practice* § 38:5 (2020) (emphasis added) (citing representative cases in which divorces were granted or not granted based on habitual cruel and inhuman treatment). In this regard, "the *chancellor* acts as the trier of fact and 'must evaluate the sufficiency of proof based on the credibility of the witnesses and the weight of their testimony.'" *Dickinson*, 293 So. 3d at 329-30 (¶20) (emphasis added) (quoting *Shavers v. Shavers*, 982 So. 2d 397, 405 (¶41) (Miss. 2008)).

¶61. Veto likewise ignores the limited standard of review we apply in this context, always mindful "that it [is] within the chancellor's discretion to consider the particular nuances of this case, weigh the evidence, and determine that the proof [met or] fell short of habitual cruel and inhuman treatment." *Gwathney v. Gwathney*, 208 So. 3d 1087, 1090 (¶9) (Miss. Ct. App. 2017).

---

Veto also asserts that in *Dickinson* (a case in which this Court affirmed the chancellor's grant of a divorce based upon habitual cruel and inhuman treatment), the wife's testimony about the "mental stress" she suffered included her testimony that she sought help from a priest and a counselor because she was afraid for her mental health, and her daughter also testified about how the defendant's behavior had "changed [her mother] from an outgoing person who loved life to a frightened, blank individual who had frequent crying outbursts." *Dickinson*, 293 So. 3d at 330 (¶23). Because such testimony is lacking here, Veto asserts that Chinelo was not entitled to a divorce based upon habitual cruelty. Although these precise circumstances are not found in this case, we do not find Veto's contentions persuasive. As we address above, divorces based on habitual cruelty and inhuman treatment "require a case-by-case analysis," *Littlefield*, 282 So. 3d at 827 (¶19), and we find that in this case substantial evidence, taken as a whole, supports the chancellor's decision to grant Chinelo a habitual-cruelty divorce.

¶62. In this case, the chancellor heard testimony about the harmful effects Veto's conduct had on Chinelo. Chinelo testified about her fear and the "emotional and mental torture" she suffered directly caused by Veto's anger. In other words, Chinelo explicitly described the direct effect his behavior had on her mental health. She testified: "[H]e scares me a lot . . . when he's angry, I can't be able to stand in his presence. It's scary. At this point, I'm scared. He's controlling. And the verbal abuse has given me a lot of emotional and mental torture." In addition to describing the "mental torture" she suffered, Chinelo described the "mental stress" she suffered because of Veto's anger: "I don't know what he's going to do, you know. I have no idea what his anger will lead to." Continuing, she said, "[W]hen he's emotional, it's like . . . something is going to bust . . . . I'm scared of it. . . . [E]very time I think, okay, what's going to happen now . . . . It's in my head. You know, he's causing me too much stress, too much—well, mental stress." We find that this testimony demonstrates the direct correlation between Veto's anger and the ill effect on Chinelo's emotional health and well-being. *See, e.g.*, *Scally v. Scally*, 802 So. 2d 128, 131 (¶¶15-16) (Miss. Ct. App. 2001) (Finding "substantial credible evidence" supported a divorce judgment based on habitual cruel and inhuman treatment where "Mrs. Scally offered testimony that during the course of their twenty-five years of marriage, Mr. Scally was moody, controlling, dominating, and verbally abusive. She testified that this conduct affected her health, and caused her to fear for her safety.").

¶63. Additionally, Chinelo, Sally, and Raphael testified about Veto's unsanitary habits,

31

including testimony about his refusal to wash his hands after using the bathroom and before handling food, and his out-of-control hoarding and refusal to clean (or allow anyone else to clean) the home's lower level, resulting in trash and clutter everywhere and an unsanitary environment. We find that this testimony constitutes evidence from which the chancellor could reasonably infer that Veto's behavior and habits likewise endangered and adversely affected Chinelo's (and the children's) physical health and well-being. *Dean v. Kavanaugh*, 920 So. 2d 528, 533 (¶20) (Miss. Ct. App. 2006) ("This Court accepts all facts and reasonable inferences which support the chancellor's findings.") (citing *Mullins v. Ratcliff*, 515 So. 2d 1183, 1189 (Miss. 1987)).

¶64. As we observed in *Gilmer*, 297 So. 3d at 335 (¶31), "once the chancellor has determined that the standard of proof has been met for granting a divorce on the ground of habitual cruel and inhuman treatment, we are not at liberty to disturb those findings unless we find manifest error of law or fact." (Quoting *Richardson v. Richardson*, 856 So. 2d 426, 431 (¶23) (Miss. Ct. App. 2003)).[14] Based upon our own review of the record and the limited

---

[14] We recognize that in *Smith*, 90 So. 3d at 1262 (¶8), this Court stated that "[a] chancellor's determination that a spouse's conduct rose to the level of habitual cruel and inhuman treatment is a determination of law, which we review de novo." We cited *Potts v. Potts*, 700 So. 2d 321, 322 (¶10) (Miss. 1997), and *Anderson*, 54 So. 3d at 851 (¶7), in support of this proposition. In declining to apply this standard of review here, we rely on our analysis in *Gwathney*, 208 So. 3d at 1090 n.1, where we explained that instead we would rely "on the more unequivocal command that an appellate court is required to respect the findings of fact made by a chancellor where they are supported by credible evidence and not manifestly wrong."

We explained in *Gwathney* that in the *Potts* decision, the supreme court relied on *Bland v. Bland*, 629 So. 2d 582, 586 (Miss. 1993), "and held that a chancellor's findings

standard of review we are bound to apply, we find that there is substantial evidence in this case supporting the chancellor's decision that Veto's behavior negatively affected Chinelo's mental and physical health and well-being and that his overall conduct was sufficient to support a divorce based on habitual cruel and inhuman treatment. Accordingly, we find no error in the chancellor's decision granting Chinelo a divorce based on this ground.[15]

## II. Utilization of the *Albright* Factors in Determining the Custody of the Couple's Two Minor Children

¶65. In *Albright*, the supreme court "reaffirm[ed] the rule that the polestar consideration

---

regarding whether a spouse's 'conduct rose to the level of habitual cruel and inhuman treatment . . . is a determination of law, and is reversible where the chancellor has employed an erroneous legal standard.'" *Gwathney*, 208 So. 3d at 1090 n.1(quoting *Potts*, 700 So. 2d at 322 (¶10)). Continuing, we observed: "However, nothing in *Bland* appears to support the concept that a chancellor's factual determination is a question of law. Instead, the [s]upreme [c]ourt stated that '[e]specially in the divorce arena, the chancellor's findings will not be reversed unless manifestly wrong.'" *Id.* (quoting *Bland*, 629 So. 2d at 587). We further observed that "no portion of *Bland* addressed a chancellor's conclusion regarding whether conduct qualified as cruel and inhuman treatment." *Id.* Taking these factors into consideration, we explained:

> Fully cognizant of our place in the hierarchy of Mississippi courts, we do not comment on the subject out of any form of criticism, but to note our awareness of the precedent, and to explain our reliance on the more unequivocal command that an appellate court is "required to respect the findings of fact made by a chancellor" where they are "supported by credible evidence and not manifestly wrong–particularly in areas of divorce."

*Id.* (quoting *Mizell v. Mizell*, 708 So. 2d 55, 59 (¶13) (Miss. 1998)). We rely on the same analysis in this case.

[15] In Veto's assignment of error entitled "Issue XIV: All Associated Orders Should be Vacated," Veto asserts that "[i]f the underlying divorce is dismissed, so should all associated orders." Because we affirm the chancellor's decision to grant Chinelo a divorce based upon habitual cruel and inhuman treatment, this assignment of error is moot.

in child custody cases is the best interest and welfare of the child," and enumerated a number of factors for a court to consider as guidance to help ensure a proper custody determination. *Albright*, 437 So. 2d at 1005. These factors include

> [the child's age, health, and gender;] a determination of the parent that has had the continuity of care prior to the separation; which has the best parenting skills and which has the willingness and capacity to provide primary child care; the employment of the parent and responsibilities of that employment; physical and mental health and age of the parents; emotional ties of parent and child; moral fitness of parents; the home, school and community record of the child; the preference of the child at the age sufficient to express a preference by law; stability of home environment and employment of each parent, and other factors relevant to the parent-child relationship.

*Id.* After analyzing and applying these factors in this case, the chancellor granted "sole physical and legal custody of the minor children to Chinelo" and supervised and telephonic visitation to Veto.

¶66. On appeal, Veto explains in his briefing that he is not challenging the chancellor's *Albright* analysis. Instead, he is "attacking . . . *Albright*, itself." He asserts that *Albright* is not "scientifically valid" because "[n]ot one of the *Albright* factors . . . has been scientifically tested to see if [these factors] measure the best interests of a child." Veto cites and quotes from a number of studies and meta-analyses that he asserts demonstrate "that the best interests of the child is obtained through joint physical custody where children have ready access to both their natural parents." In doing so, Veto explains that "he wants Mississippi appeals courts to start thinking about how scientific findings in sociological and psychological research raise hard questions about *Albright*." He asserts that the chancellor's

34

"custody decision should be overturned" because of "the inability of an *Albright* analysis to determine the best interests of a child."

¶67. We appreciate Veto's research and the information he has presented. As an intermediate appellate court, however, we are bound by *Albright* and its progeny. As we have stated above, we are simply not authorized to overrule or ignore supreme court precedent. *Beckham*, 296 So. 3d at 124 n.4.

¶68. Veto also suggests that the chancellor erred when he "abrogated a parol custody agreement" between Veto and Chinelo and entered a temporary custody order in November 2017 granting Chinelo custody of the children and granting Veto visitation every other weekend. We are unable to determine the circumstances surrounding this temporary order based upon the record before us. Veto's assertions on this point are therefore procedurally barred. *See Oakwood Homes Corp. v. Randall*, 824 So. 2d 1292, 1293 (¶4) (Miss. 2002) ("The appellant has the duty of insuring that the record contains sufficient evidence to support his assignments of error on appeal[,] . . . [and] [t]he [appellate] [c]ourt may only act on the record presented to it." (citations and internal quotation marks omitted)). In any event, we observe that the chancellor's July 2, 2019 final judgment set forth his detailed determination on all issues relating to custody and visitation. When a matter proceeds to a final judgment, as in this case, questions regarding temporary custody are moot and we do not consider them. *See In re City of Biloxi*, 113 So. 3d 565, 572 (¶20) (Miss. 2013) ("The [appellate] [c]ourt does not adjudicate moot questions.").

### III.    The Rule 59 Hearing and Veto's Rule 52 Request

¶69.    After the chancellor entered his July 2, 2019 final judgment, Veto filed a number of motions, including a motion for a new trial or to alter or amend the judgment pursuant to Rule 59. On appeal, Veto asserts that the chancellor erred when he "refused to conduct a de novo hearing" on his Rule 59 motion and when the chancellor denied his motion and did not "provide [supporting] written Findings of Fact and Conclusions of Law" as Veto requested pursuant to Rule 52. We find no merit in these assertions for the reasons addressed below.

¶70.    With respect to Veto's Rule 59 motion, the supreme court has held that "in order to succeed on a Rule 59(e) motion, the movant must show: (i) an intervening change in controlling law, (ii) availability of new evidence not previously available, or (iii) need to correct a clear error of law or to prevent manifest injustice." *Brooks v. Roberts*, 882 So. 2d 229, 233 (¶15) (Miss. 2004). In this case, from our review of Veto's fifty-six page Rule 59 motion, it appears that it was based upon the third alternative, i.e., the "need to correct a clear error of law or to prevent manifest injustice."

¶71.    Veto does not address the merits of his Rule 59 motion on appeal, but instead, as noted, he asserts that the chancellor erred when he did not conduct a "de novo" hearing on his motion. Veto cites *Bruce v. Bruce*, 587 So. 2d 898 (Miss. 1991), among other cases, in support of this assertion. In *Bruce*, the supreme court recognized that "[w]hen hearing a motion under Rule 59(e), a trial court proceeds de novo, if not ab initio." *Id.* at 904. As the supreme court explained, "[r]ecognizing that to err is human, Rule 59(e) provides the trial court the proverbial chance to correct its own error to the end that we may pretermit the

occasion for a less than divine appellate reaction." *Id.*

¶72. We find that this reference to the trial court proceeding "de novo" describes the fresh look the trial court employs in reviewing the record when considering the movant's Rule 59(e) arguments—i.e., whether the movant has shown a "need to correct a clear error of law or to prevent manifest injustice." Based upon the record before us, we find no indication that the chancellor did not employ such a review in this case.

¶73. Specifically, the record contains Veto's self-described "Rule 59 Motion [that] covered 56 actual pages containing 36,587 words and 116 unique cites to authority including 65 unique cites to Mississippi caselaw" in which Veto details his Rule 59 arguments. The record also indicates that the chancellor conducted a hearing on Veto's Rule 59 motions on November 7, 2019. The only portion of the November 7, 2019 hearing transcript included in the record is a three-page excerpt entitled "Motions Hearing Excerpt -Verbal Denial of Defendant's Rule 59 Motion." But even this short excerpt demonstrates that the chancery court thoroughly considered the Rule 59 arguments that Veto made in his motion:

> [THE COURT:] Your [Rule 59] motion, your argument, your objection . . . has been noted in the record numerous times and it is noted again today. . . . *Mr. Roley, I have reviewed your extensive and thoroughly well-drafted pleadings.* I have told you before and, sir, I'm telling you again, I'm unable to set aside the divorce.

(Emphasis added). Further, the chancellor's November 14, 2019 order denying Veto's Rule 59 motions (among other motions) plainly states that the chancellor considered the record and evidence before him in reaching his decision, as follows:

THIS CAUSE came on for a hearing on November 7, 2019[,] on the Defendant's Rule 59 motions . . . . Both the Plaintiff and the Defendant proceeded pro se. *After considering the Court file and hearing oral arguments on the matter*, the Court does hereby FIND, ORDER, ADJUDGE and DECREE . . . [t]he Defendant's Rule 59 motions . . . hereby DENIED.

¶74. In sum, we find no indication in the record that the chancellor failed to consider Veto's Rule 59 arguments "de novo"—particularly in light of the chancellor's statement to Veto that he had "reviewed [Veto's] extensive and thoroughly well-drafted pleadings," and the explicit statement in the chancellor's order that it was made "[a]fter considering the Court file and hearing oral arguments on the matter." Veto's assertions to the contrary are without merit.

¶75. We also point out that Veto only designated a three-page excerpt from the November 7, 2019 hearing. As such, to the extent Veto may be attempting to assert any additional challenge as to what occurred at that hearing, he has failed to fulfill his duty to designate a sufficient record for this Court's review, *Oakwood Homes Corp.*, 824 So. 2d at 1293 (¶4), and we are therefore bound to presume the chancellor properly considered Veto's arguments and that the chancellor's decision was correct. *Id.* at 1294 (¶7) ("[T]he burden is on the appellant to demonstrate why the lower court was in error. Because we presume that the decisions of the lower courts are correct, we must affirm." (Internal citation omitted)).

¶76. Veto also asserts that the chancellor erred when he did not make additional findings of fact and conclusions of law in response to Veto's Rule 52 request "to explain [the chancellor's] reasons for denying [Veto's Rule 59] motion." Rule 52 provides:

38

a) Effect. In all actions tried upon the facts without a jury the court may, and shall upon the request of any party to the suit or when required by these rules, find the facts specially and state separately its conclusions of law thereon and judgment shall be entered accordingly.

(b) Amendment. *Upon motion of a party filed not later than ten days after entry of judgment or entry of findings and conclusions*, or upon its own initiative during the same period, *the court **may** amend its findings or make additional findings and may amend the judgment accordingly*. The motion may accompany a motion for a new trial pursuant to Rule 59.

M.R.C.P. 52 (emphasis added).

¶77. The record reflects that substantial findings of fact and conclusions of law were made by the chancellor, both in the judgment of divorce and in the subsequent final judgment that Veto ultimately appealed. Veto's Rule 52 motion, incorporated into his Rule 59 motion, was essentially a request to *amend* the judgments already rendered to "detail," in Veto's words, "[h]ow Chinelo . . . met her obligation to prove real harm, which is an obligation under the laws of Mississippi." Such a request is governed by Rule 52(b), which makes clear that whether to issue findings "additional" to those already made is discretionary. M.R.C.P. 52(b).

¶78. We find no abuse of discretion in the chancellor not issuing additional findings in support of his decision that the original judgments should stand in this case. As the advisory committee note to Rule 52 provides, "[t]he principal purpose of the rule is to provide the appellate court with a record regarding what the trial court did—the facts it found and the law it applied[.]" The chancellor's judgment of divorce and the final judgment are more than sufficient to explain the court's decisions and to furnish a basis for appellate review. *See Cox*

39

*v. Cox*, 976 So. 2d 869, 880 (¶55) (Miss. 2008) (finding that the chancellor's refusal to issue more specific findings of fact and conclusions of law in support of his dismissal for failure to prosecute plaintiff's complaint was not an abuse of discretion where "[t]he chancellor's bench opinion was sufficient to explain and support his adjudication of the matter"); *Thompson v. Hutchinson*, 84 So. 3d 840, 845 (¶24) (Miss. Ct. App. 2012) (finding "that the chancellor did not err in denying [the father's Rule 52] request to make specific findings of fact and conclusion of law [regarding the chancellor's custody decision where] [t]he chancellor's bench opinion was sufficient to explain and support his findings in the present case").

### IV.  Tax Deduction for Minor Son

¶79.    Veto asserts that the chancellor "made an error in equity and fairness" when he did not allow Veto a tax deduction for the couple's minor son "without giving [Veto] credit for lost revenues on his tax return."  We find no merit in this assignment of error.

¶80.    To clarify, the chancellor actually ordered that beginning 2019, Veto *could* claim his minor son as a tax deduction—but the chancellor further ordered that Veto could only do so if he was current on his child support at year-end.  Regarding the 2018 tax year, the chancellor found that Veto admitted he was not current on his child support payments, so he ordered that Chinelo could claim both children for 2018 taxes.  Veto has not cited any authority for the proposition that a chancellor must award a party a "credit for lost revenues" if that party is denied a tax deduction under these circumstances.  Because he has failed to do so, we find that this issue is waived.  *See Burgess v. Williamson*, 270 So. 3d 1031, 1034-

40

35 (¶14) (Miss. Ct. App. 2018) (finding that the appellant waived her claim on appeal that the chancery court "erred in assuming jurisdiction" where she failed "to cite authority or develop this argument"), *cert. denied*, 229 So. 3d 712 (Miss. 2017); M.R.A.P. 28(a)(7) (Appellant's "argument shall contain the contentions of appellant with respect to the issues presented, and the reasons for those contentions, with citations to the authorities, statutes, and parts of the record relied on."). In any event, given the chancellor's "wide latitude in fashioning equitable remedies in domestic-relations matters," *Dickinson*, 293 So. 3d at 326 (¶5), we find no manifest error in the chancellor's ruling on this issue.

¶81. Veto also asserts that the chancellor's ruling on the tax deductions (contained within his final judgment) was issued without notice. We find this assertion without merit. The docket clearly reflects that the second half of the bifurcated trial was set for the very purpose of addressing "all remaining issues" in the case, including child custody and related matters that necessarily encompassed child support, insurance, and tax deductions relating to the children.

¶82. Also without merit is Veto's assertion that the chancellor erred when he did not use the "required" five-factor test set forth in *Louk v. Louk*, 761 So. 2d 878, 884 (¶17) (Miss. 2000), when determining who was entitled to a tax deduction. First, Veto specifically states in his brief that he "does not have a problem, per se, with [the chancellor] giving the deduction to [Chinelo]," but instead, Veto contends he should have been given a credit for the "lost revenue." Because Veto does not challenge the tax deduction *allocation* on appeal,

41

whether the "*Louk* test" was applied is not relevant. Second, even if Veto did challenge the tax deduction allocation, a chancellor is not required to apply the factors mentioned in *Louk* in making this decision. As the supreme court observed in that case, "*[a]lthough many cases do not involve incomes or estates significant enough to justify this type of analysis*, a Chancellor would be well-served to consider these factors *where appropriate*." *Id.* at (¶18) (emphasis added). We find nothing in the record indicating that a *Louk* analysis was required in this case. For the stated reasons, this assignment of error is without merit.

## V.    Alleged Judicial Bias

¶83.    Veto asserts that the first chancellor displayed judicial bias against him, particularly during the June 5, 2018 hearing on Veto's "Rule 59 Motion for a Rehearing" that he filed after the November 2017 divorce-grounds trial was completed. Based upon the applicable law and our review of the June 5, 2018 hearing transcript, we find Veto's assignment of error on this point without merit.

¶84.    To briefly summarize the procedural history on this point, Veto filed a motion to recuse the first chancellor, accompanied by his supporting affidavit, on December 5, 2018. Although Veto's motion for recusal is in the appellate record, and the case docket indicates that a hearing was set for December 7, 2018, to address this motion, the record does not contain any hearing transcript or an order on the motion. It appears from the case docket, however, that the chancellor denied Veto's motion for recusal because this chancellor continued to issue orders until he retired in December 2018 and the second chancellor was assigned the case as of January 2019. In any event, Veto's motion was effectively denied in

42

the second chancellor's final judgment entered July 2, 2019.

¶85. Chinelo asserts that Veto's assignment of error is procedurally barred because Veto failed to comply with Mississippi Rule of Appellate Procedure 48B, which delineates the review process when a chancellor denies a motion for recusal or does not rule on the motion within thirty days. Rule 48B provides:

> If a judge . . . shall deny a motion seeking the trial judge's recusal, or if within 30 days following the filing of the motion for recusal the judge has not ruled, the filing party may within 14 days following the judge's ruling, or 14 days following the expiration of the 30 days allowed for ruling, seek review of the judge's action by the Supreme Court.

¶86. In support of her assertion, Chinelo points out that even using the July 2, 2019 date when the final judgment was entered, the record and the case docket reflect that Veto failed to seek judicial review of the chancellor's decision on recusal within fourteen days of the "ruling" or within thirty days of Veto's filing his motion if no ruling had been entered. We agree. Nevertheless, we address Veto's assertions on the merits based upon the permissive rather than mandatory nature of Rule 48B. *See Hathcock v. S. Farm Bureau Cas. Ins. Co.*, 912 So. 2d 844, 848 (¶8) (Miss. 2005) (recognizing the use of the permissive term "may" in Rule 48B and determining that a party's failure to comply with the timing requirements of Rule 48B will not bar an otherwise timely appeal of a trial court's denial of the appellant's motion for recusal); *West v. State*, 131 So. 3d 583, 586 (¶9) (Miss. Ct. App. 2013) (citing *Hathcock* and addressing the merits of the party's appeal of the trial court's denial of his motion for recusal despite noncompliance with Rule 48B).

43

¶87. "We review a trial judge's denial of a motion to recuse under the 'manifest abuse of discretion' standard." *In re B.A.H.*, 225 So. 3d 1220, 1232 (¶40) (Miss. Ct. App. 2016) (quoting *Hathcock*, 912 So. 2d at 849 (¶11)). With respect to the standard applicable in determining whether recusal is warranted, we recognize that in some cases the supreme court has stated that we must "presume[] that a judge, sworn to administer impartial justice, is qualified and unbiased. For a party to overcome the presumption, the party must produce evidence of a reasonable doubt about the validity of the presumption." *Kinney v. S. Miss. Planning & Dev. Dist. Inc.*, 202 So. 3d 187, 194 (¶20) (Miss. 2016) (citation omitted). However, we find the better standard was articulated by the supreme court in *Dodson v. Singing River Hospital System*, 839 So. 2d 530 (Miss. 2003), as follows:

> The stringent "beyond a reasonable doubt" burden is, in our opinion, incompatible with the standard of a hypothetical "reasonable person knowing all the circumstances." The proper standard is that recusal is required when the evidence produces a reasonable doubt as to the judge's impartiality. The misapplication of the "beyond a reasonable doubt" burden in [other] cases was nothing more than a minor oversight and would have led to the same conclusion. We now clarify the burden of proof from what was previously stated . . . .

*Id.* at 533 (¶13).

¶88. Veto asserts that the chancellor denied him a fair trial by "forcefully advocat[ing] for [Chinelo]" at the June 5, 2018 hearing and "obstruct[ing]" Veto from "presenting his case in chief." Based upon our review of the record, including the June 5, 2018 hearing transcript, we find that Veto has failed to produce a reasonable doubt regarding the chancellor's impartiality at that hearing or at any point in this case.

44

¶89. On the contrary, after Veto presented his arguments in support of his motion to "reopen his [case-in-]chief," the chancellor *granted* Veto's motion for a rehearing for the limited purpose of allowing Veto to present testimony "pertaining to new matters not addressed during the bifurcated trial on divorce grounds." Veto takes issue with the chancellor's "interruptions" at the hearing, but we find no evidence of "bias" in the way in which the chancellor conducted the hearing. The transcript reflects that despite the chancellor's ruling that any testimony presented must pertain to "new matters" not addressed at the trial, Veto persisted in questioning Chinelo about issues already covered by Veto's then-attorney at the trial. We find no indication that the chancellor was "advocating" for Chinelo when he stopped Veto from repeatedly asking similar questions or attempted to move the questioning along by requesting that Veto focus on the point he was attempting to make or by questioning Chinelo, himself, to clarify her testimony.

¶90. In short, our review of the record and the transcript from the June 5, 2018 hearing shows no bias warranting recusal. The manner in which the chancellor conducted the divorce trial and June 5, 2018 hearing in no way constituted the "combative, antagonistic, discourteous, and adversarial" conduct that would lead a reasonable person to conclude that Veto did not receive a fair hearing. *Cf. Schmidt v. Bermudez*, 5 So. 3d 1064, 1074 (¶¶19-21) (Miss. 2009) (finding that a chancellor's "abusive and inappropriate conduct," including, but not limited to, repeatedly questioning a party's honesty, badgering that party during cross-examination regarding evidence to be presented in her own case, and accusing the party

45

of "diarrhea of the mouth" violated the party's substantive right to a fair trial). We reject this assignment of error.

## VI. Section 11-51-29's Requirement to Prepay Appeal Costs and Fees

¶91. Veto asserts that the chancery court erred when it denied his request to proceed in forma pauperis on appeal. In denying Veto's request, the chancery court found that "[u]nder Mississippi law there is no right for a civil litigant to proceed in forma pauperis in an appeal to the Supreme Court. *Nelson v. Bank of Mississippi*, 498 So. 2d 365, 366 (Miss. 1986)." We find that the chancery court was correct and that Veto's assertion is without merit.

¶92. In Mississippi, the statutory right to proceed in a civil action "without being required to prepay fees or give security for costs" pursuant to Mississippi Code Annotated section 11-53-17 (Rev. 2019), "applies only to a court of original jurisdiction, and not to courts of appeal." *Life & Cas. Ins. Co. v. Walters*, 190 Miss. 761, 200 So. 732, 733 (1941); *see Ivy v. Merchant*, 666 So. 2d 445, 450 (Miss. 1995); *Nelson*, 498 So. 2d at 365-66; *5K Farms Inc. v. Miss. St. Tax Comm'n*, 94 So. 3d 291, 294 (¶11) (Miss. Ct. App. 2011), *aff'd sub nom. 5K Farms Inc. v. Miss. Dep't of Revenue*, 94 So. 3d 221 (Miss. 2012). As such, in civil appeals, the appellant is required by section 11-51-29 to prepay costs and fees, including the cost of preparing the record for appeal.

¶93. Veto challenges the constitutionality of section 11-51-29, asserting that due process requires that indigent litigants, like himself, should be afforded the right to appeal in divorce and custody cases without prepayment of costs, just as they are allowed to do at the trial court level. This Court has already addressed and rejected a virtually identical constitutional issue

46

in *Schonewitz v. Pack*, 913 So. 2d 416, 423-24 (¶32) (Miss. Ct. App. 2005).  We likewise reject Veto's claim here, as we discuss below.  *See also J.R.T. v. Harrison Cnty. Fam. Ct.*, 749 So. 2d 105, 107-10 (¶¶15-29) (Miss. 1999) (holding that parents were not entitled to in forma pauperis status in an abuse/neglect case).

¶94.    Veto relies on *M.L.B v. S.L.J.*, 519 U.S. 102 (1996), in support of his constitutional challenge to section 11-51-29.  In *M.L.B*., the United States Supreme Court held that section 11-51-29 violates principles of due process and equal protection when applied to bar an indigent parent from appealing a lower court's termination of her parental rights.  *Id.* at 107. Veto's case, however, involves a custody dispute; Veto's parental rights were not terminated. Veto's constitutional challenge, therefore, is distinguishable from the circumstances in *M.L.B*., as the United States Supreme Court recognized in that case, and as the Mississippi Supreme Court and this Court have also held.

¶95.    The United States Supreme Court in *M.L.B.* specifically explained the distinction between a parental rights termination decree and "mine run civil actions . . . [including] other domestic relations matters such as divorce, paternity, and child custody." *Id.* at 128.  It found that termination decrees "wor[k] a unique kind of deprivation," *id.* at 127 (quoting *Lassiter v. Dep't of Soc. Servs. of Durham Cnty., N.C.*, 452 U.S. 18, 27 (1981)), in contrast to other domestic matters "modifiable at the parties' will or based on changed circumstances." *Id.* at 127-28. *See also J.R.T.*, 749 So. 2d at 107-10 (¶¶15-29).

¶96.    We addressed the distinctions made in *M.L.B*. between a parental termination order

47

and an order delineating child custody and visitation in *Schonewitz*. In that case, the child's natural mother challenged the chancellor's order granting sole physical and legal custody to the child's paternal grandparents, subject to the visitation rights the chancellor granted to the natural mother. *Schonewitz*, 913 So. 2d at 420 (¶16). After discussing the distinguishing characteristics between a permanent severance of a parent/child relationship and a custody situation, and noting the visitation rights granted the natural mother in the case before it, this Court affirmed the chancellor's order, determining: "We are unable to find that the chancellor's granting of sole legal and physical custody to the [grandparents] constitutes the termination of a fundamental right that would merit an in forma pauperis appeal. The loss of custody does not sever the parent-child bond." *Id.* at 423 (¶32) (citing *M.L.B.*, 519 U.S. at 121).

¶97. In this case, Veto was granted supervised visitation rights and telephonic visitation with the children three days a week. Based upon the authorities addressed above, we do not find a permanent severance in the relationship between Veto and his children under these circumstances that would "constitute[] . . . termination of a fundamental right that would merit an in forma pauperis appeal." *Id.* Accordingly, we reject Veto's constitutional challenge to section 11-51-29, and we affirm the chancery court's denial of Veto's in forma pauperis petition.

### VII. Section 93-11-65(1)(a) (Governing Testimony by Children in Divorce Proceedings Regarding Custody Preference)

¶98. Section 93-11-65(1)(a) provides that under certain conditions, the chancery court may

consider the custody preference of a child who is twelve years old or older in determining the best interest of that child. Veto asserts that the chancery court erred when it denied his motions requesting that his minor children be allowed to testify regarding their custody preferences, despite the fact that both children were under the age of twelve at the time of trial. Regarding section 93-11-65(1)(a) in particular, Veto asserts that this statute is "prima facie unconstitutional as an arbitrary prior restraint to free speech to children of divorce." We find that Veto's assertions are procedurally barred and without merit for the reasons we address below.

### A.    Application of Section 93-11-65(1)(a)

¶99.    We begin our discussion by addressing Chinelo's assertion that Veto's assignment of error is without merit for the simple reason that the February 12, 2018 judgment of divorce provides that on January 5, 2018, the first chancellor *granted* Veto's "Petition to Have Minor Child [] Testify" and the chancellor "took testimony from the minor [son] in chambers." Veto asserts that he has never seen the testimony, and if any testimony had been taken it would not be relevant because it was taken one-and-a-half years before the June 2019 trial in which child custody, among the other remaining issues, was addressed. We accept this proposition for purposes of our analysis, noting that the case docket reflects that shortly before the June 2019 trial Veto filed additional motions requesting that the couple's minor children be allowed to testify as to their custody preference.[16]

---

[16] The motions were not made a part of the appellate record.

49

¶100. Nevertheless, we reject Veto's contention that the second chancellor erred when he did not allow the minor children to testify as to their custody preference. We find that this assignment of error is procedurally barred because Veto made no proffer of the children's testimony. *See, e.g., Waller v. Wall*, 273 So. 3d 717, 720 (¶11) (Miss. 2019) (finding that the plaintiffs' contention that the chancellor erred in excluding physician witnesses' testimony was procedurally barred on appeal where plaintiffs "failed to preserve the issue by making an offer of proof as to the physician witnesses' testimony"). As the supreme court recognized in *Waller*, without a proffer, "this Court has no way to know what the witnesses would have actually said, so it cannot find any error in the exclusion of their testimony." *Id.* (citing M.R.E. 103). The same rule applies in this case, and thus we find the issue of the exclusion of the minor children's testimony barred. *See id.* at (¶12).

¶101. Notwithstanding this procedural bar, we also reject Veto's contention on the merits. In relevant part, section 93-11-65(1)(a) provides that under certain conditions (discussed below) "the chancellor may consider the preference of a child of twelve . . . years of age or older as to the parent with whom the child would prefer to live in determining what would be in the best interest and welfare of the child." We find no error in the chancellor's denial of Veto's motion based upon a plain reading of section 93-11-65(1)(a). As the chancellor determined, "the statute is unambiguous in setting the age limit for children to testify regarding custody preference at twelve years old." Both children in this case were under twelve years old at the time of trial.

¶102. We also find that the statute sets forth two conditions that must be met before the court may, in its discretion, consider a child's custody preference. *See Ferguson*, 639 So. 2d at 932 (Miss. 1994). Namely, section 93-11-65(1)(a) provides that before taking a child's custody preference into account, the court "shall find" (1) that "*both* parties are fit and proper persons to have custody of the children"; and (2) that "*either party* is able to adequately provide for the care and maintenance of the children[.]" (Emphasis added). If the court so finds, it "may consider the [custody] preference of a child [twelve or over.]" *Id.*

¶103. The record reflects that the chancellor found that neither condition was met in this case. On the contrary, the chancellor granted sole physical and legal custody of the minor children to Chinelo and granted Veto supervised visitation and telephonic visitation. As detailed in the chancellor's final judgment, the chancellor applied the *Albright* factors and found that Chinelo prevailed on numerous factors, including continuity of care; parenting skills; employment and employment responsibilities; mental health; stability of the home environment; the child's home, school, and community record; and the "any other factor" catchall provision.

¶104. In assessing the parties' parenting skills, for example, the chancellor noted Veto's inability to refrain from disparaging Chinelo or discussing the divorce in front of the children and found that this factor favored Chinelo. Addressing the mental health and moral fitness of the parties, the chancellor stated that he had concerns about Veto's mental health in light of findings made in Veto's psychological evaluation regarding Veto's criticism of Chinelo

51

to their children and the damaging nature of Veto's display of aggressive behavior in front of his children. The chancellor therefore found that although the parties' physical health was a neutral consideration, the mental health and moral fitness aspect of this factor weighed in Chinelo's favor. The chancellor also noted the guardian ad litem's recommendation that Veto's visitation with the children be supervised because Veto could not be trusted not to disparage Chinelo in front of them. Additionally, the chancellor found that the employment and the stability of the home environment factors weighed in Chinelo's favor because of (1) her more stable, full-time employment; (2) Veto's failure to secure housing (the marital home that Veto had been living in had been foreclosed upon); and (3) Veto's "deplorable" living conditions. The chancellor found the remaining factors neutral, except the children's preferences, which he found did not apply. Based upon the chancellor's findings and the plain language of section 93-11-65(1)(a), we find no error in the chancellor's decision not to consider testimony from the minor children regarding their custody preference.

## B.    Constitutionality of Section 93-11-65(1)(a)

¶105. Veto also asserts that section 93-11-65(1)(a) is "prima facie unconstitutional as an arbitrary prior restraint to [a minor child's] free speech." We find that Veto's challenge to the constitutionality of section 93-11-65(1)(a) is barred by the principle that courts should refrain from ruling on the constitutionality of a statute unless it is  necessary to do so. As the supreme court recognized in *Western Line Consolidated School District v. Greenville Municipal Separate School District*, 433 So. 2d 954, 957-58 (Miss. 1983), "if it is not necessary to rule upon the constitutionality of a statute, it is necessary that a court not rule

52

upon it . . . . Courts do not touch the constitutionality of a statute when it is unnecessary to do so under the particular facts of the case." *See In re D.D.H.*, 268 So. 3d 449, 451-52 (¶9) (Miss. 2018) ("The constitutionality of a statute will not be determined unless absolutely necessary to determine the merits of the litigation in which the constitutional issue has been presented." (quoting *Roberts v. Miss. State Highway Comm'n*, 309 So. 2d 156, 160 (Miss. 1975)).

¶106. The chancellor made extensive findings of fact regarding Veto's inappropriate behavior and inability to provide a stable home environment in support of the chancellor's decision to grant sole physical and legal of the couple's minor children to Chinelo. The chancellor made no finding that *both* parents were "fit and proper" custodial parents or that they were equally able to provide for the children's care and maintenance—the two statutory conditions required under section 93-11-65(1)(a) before a chancellor, in his discretion, may consider a child's custody preference. As such, section 93-11-65(1)(a) does not apply under the facts of this case.

¶107. Further, the chancellor found that a majority of the *Albright* factors favored Chinelo; thus, it is unlikely that considering either child's custody preference would have changed the outcome in this case. *Cf. Giannaris v. Giannaris*, 962 So. 2d 574, 581 (¶18) (Miss. Ct. App. 2006) (finding that "even if the chancellor erred in finding that [the child]'s age favored neither parent, this error was harmless because the court found that the majority of the factors (seven) clearly favored the father") (reversed on other grounds by *Giannaris v. Giannaris*,

960 So. 2d 462 (Miss. 2007)). Based upon the long-standing authority discussed above, because there is an alternative means of resolving Veto's assertion that the chancery court erred when it prevented his minor children from testifying regarding their custody preferences, it is incumbent upon this Court to refrain from deciding the constitutionality of the child preference provisions in section 93-11-65. We therefore decline to address Veto's constitutional challenge to section 93-11-65.

## VIII. The Mississippi Electronic Courts (MEC) Filing System

¶108. Veto asserts that "the MEC system gives an unconstitutional advantage to represented litigants over pro se litigants" and contends that this Court should "order, as a matter of due process fairness, [that] pro se litigants be added to the MEC system." Currently, under the Administrative Procedures for Mississippi Electronic Courts (APMEC), pro se litigants "may register to receive 'read only' public access accounts," *id.* at Section 1B, but "[d]ocuments filed by pro se litigants shall be filed conventionally." *id.* at Section 6A(4)(b).

¶109. Veto fails to cite any authority supporting his suggestion that this Court "order" that pro se litigants be added to the MEC filing system. Accordingly, this issue is procedurally barred. M.R.A.P. 28(a)(7); *see Burgess*, 270 So. 3d at 1035 (¶14) (rejecting appellant's assignment of error where she failed to cite authority supporting her argument). Indeed, this Court is not authorized to amend the APMEC and adopt a rule mandating that pro se litigants be added to the MEC system, as Veto suggests. As a general rule, the power to establish or change rules of practice and procedure is vested in the Mississippi Supreme Court, not this Court. *See Jones v. City of Ridgeland*, 48 So. 3d 530, 536 (¶11) (Miss. 2010) (explaining

54

that the supreme court's power to "promulgate procedural rules" and "establish its own rules of practice and procedure" is derived from Article 6, Section 144 of the Mississippi Constitution, which provides that "[t]he judicial power of the State shall be vested in a Supreme Court and such other courts as are provided for in this Constitution." Miss. Const. art. 6, § 144); *see also* Miss. Code Ann. § 9-3-61 (Rev. 2019) ("As a part of the judicial power granted in Article 6, Section 144 . . . the Supreme Court has the power to prescribe . . . by general rules . . . the practice and procedure for trials and appeals in the Court of Appeals and in the circuit, chancery and county courts of this state . . . .").

¶110. Specifically regarding rules and regulations pertaining to the MEC filing system, Mississippi Code Annotated section 9-1-53 (Rev. 2019) requires that courts and circuit and chancery clerk offices that implement electronic filing and storage "shall do so in conformity with such rules and regulations *prescribed by the Administrative Office of Courts and adopted by the Mississippi Supreme Court* concerning court records or court-related records." (Emphasis added). Because this Court is without authority to promulgate rules or procedures relating to the MEC filing system, we decline to address Veto's assertions for this additional reason.

## IX. Denial of Post-Appeal Motion for Visitation Modification

¶111. After filing his notice of appeal, Veto filed a motion requesting a modification in visitation with his children. In his final judgment, the chancellor granted Chinelo sole legal custody of the minor children based upon his analysis of the *Albright* factors and "because of Veto's inability to co-parent with Chinelo, which is evident in the way he constantly

55

disparages her in front of the children." Veto was granted supervised visitation from 9:00 a.m. to 6:00 p.m. every other Sunday and telephonic visitation from 7:00-7:30 p.m. every Monday, Wednesday, and Friday. In his post-appeal motion, Veto sought "*unsupervised* visitation with his minor children every Sunday from 8 a.m. to 6 p.m. so that he can ensure their religious education" (emphasis added) and "during the weeks that school is in session, unsupervised visitation from 6 p.m. to 8 p.m. on Tuesday and Thursday for the purpose of [assisting the children with] schoolwork and homework."

¶112. Citing *McNeese v. McNeese*, 129 So. 3d 125 (Miss. 2013), the chancellor denied Veto's motion, finding he was without authority to amend Veto's visitation with his children while the matter was on appeal. *Id.* at 128 (¶7). Veto asserts on appeal that the chancellor erred in "denying" his motion for visitation modification, rather than "staying" his decision "for the duration of the appeal." We find no merit in Veto's assignment of error—the chancellor clearly articulated the basis for his decision and his reliance on the plainly stated principle that he was without authority to do so under *McNeese*, 129 So. 3d at 128 (¶7). We find nothing in the chancery court's order that would prevent Veto from seeking visitation modification post-appeal.

¶113. We recognize that there exists an exception to the general rule stated in *McNeese*, which is that "[a] chancellor . . . *may* modify child support, custody and visitation while a case is on appeal *if a proper basis for doing so is shown* . . . ." *Halle v. Harper*, 869 So. 2d 439, 440 (¶3) (Miss. Ct. App. 2004) (emphasis added) (citing *Smith v. Necaise*, 357 So. 2d

56

931, 933 (Miss. 1978)). In *Halle*, this Court stated that "[t]his is not to say that chancellors should freely or frequently consider motions for modifications of their domestic case decrees after they have been appealed." *Id.* Nevertheless, "[a]ddressing *potentially legitimate pleas of material changes in circumstances* beyond what is shown in the record on appeal, may *occasionally* be necessary." *Id.* (emphasis added).

¶114. In this case, however, even if Veto had asserted that this exception were applicable, his argument would be procedurally barred. As an appellate court, we "may only act on the record presented to [us]." *Oakwood Homes Corp.*, 824 So. 2d at 1293 (¶4). The record is wholly insufficient so as to allow this Court to determine whether Veto demonstrated that a "material change[] in circumstances" occurred post-judgment warranting a visitation modification. In his motion, Veto sought unsupervised visitation with his children on Sundays, but a primary reason the chancellor required that Veto have *supervised* visitation with them was due to Veto's disparaging remarks about Chinelo in front of the children and his inability to co-parent with her. Veto points to no evidence in the record that demonstrates these circumstances have changed.

¶115. Veto also alleges in his motion for modification that "[d]espite being intelligent and able to do the work, [the couple's minor son] continues to struggle in school and [Chinelo] and her nieces and nephew continue to be incapable of assisting him to success." Veto, however, points to no evidence in the record that this is so, nor is there any basis for comparison regarding the children's progress at school because the transcript from the June

7 and 26, 2019 trial that addressed the issues of "custody, visitation, . . . and related matters" is not in the record. In sum, any assertion that an exception existed to *McNeese* in this case is procedurally barred because Veto has wholly failed to provide a sufficient record in support of such a contention. *Oakwood Homes Corp.*, 824 So. 2d at 1293 (¶4).

## X.      Taxation of Costs

¶116. Veto asserts that all costs of this appeal should be assessed against the chancery court because "the decision to issue a divorce on the basis of habitual cruel and inhuman treatment is simply unconscionable in light of well-established . . . caselaw" on this issue. Alternatively, Veto asserts that Chinelo should be taxed with appeal costs because "once the law is correctly applied to the facts of this case, [Chinelo's] petition for divorce will be shown to be frivolous."

¶117. We reject Veto's assertions because we find no error in the chancellor's decision granting Chinelo a divorce based on habitual cruel and inhuman treatment, nor do we find that the chancellor's final judgment should be reversed on any other basis. Mississippi Rule of Appellate Procedure 36 provides that "[i]f a judgment is affirmed, costs shall be taxed against the appellant unless otherwise ordered." We find no reason to "otherwise order[]" that Veto is entitled to avoid payment of Rule 36 costs in this case.

¶118. We further find that even if we had found that reversal was warranted, there is no merit in Veto's contention that the chancery court should be taxed with appeal costs. Veto cites no authority supporting this assertion or entitling him to any such relief. This assignment of error is both meritless and procedurally barred. M.R.A.P. 28(a)(7); *Burgess*,

270 So. 3d at 1035 (¶14).  The chancellor's decision is affirmed.

¶119.  **AFFIRMED.**

**BARNES, C.J., WILSON, P.J., GREENLEE, WESTBROOKS, McDONALD, McCARTY, SMITH AND EMFINGER, JJ., CONCUR.  LAWRENCE, J., NOT PARTICIPATING.**